# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GEORGE MOORE, individually
and on behalf of a class of all persons and
entities similarly situated,  Case No. 1:20-cv-00980
  Honorable Thomas M. Durkin

   Plaintiff,
  (Jury Trial Requested)
vs.

CHARTER COMMUNICATIONS, INC.

   Defendant.

**FIRST AMENDED CLASS ACTION COMPLAINT**

**Preliminary Statement**

1. Plaintiff George Moore brings this action under the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, *et seq.*, a federal statute enacted in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *See Mims v. Arrow Fin. Servs., LLC,* 132 S. Ct. 740, 745 (2012).

2. Mr. Moore alleges that Defendant Charter Communication, Inc., ~~or a~~ via third party agents~~,~~ calling on its behalf, initiated telephone solicitations promoting Charter's television, internet and voice services to his residential telephone number despite the fact his number has long been listed on the National Do Not Call Registry.

3. Because these calls were transmitted using technology capable of generating thousands of similar calls per day, Mr. Moore sues on behalf of a proposed nationwide class of other persons who received similar calls.

4. A class action is the best means of obtaining redress for the Defendant's illegal telemarketing and is consistent both with the private right of action afforded by the TCPA and the fairness and efficiency goals of Rule 23 of the Federal Rules of Civil Procedure.

### Parties

5. Plaintiff George Moore resides in this district.

6. Defendant Charter Communications, Inc. is a Delaware corporation with its corporate headquarters in Stamford, CT. It does business throughout the United States, including in this District.

7. Charter sells television, internet, and voice services to customers through its "Spectrum" brand.

### Jurisdiction & Venue

8. The Court has federal question jurisdiction under 28 U.S.C. § 1331 and 47 U.S.C. § 227 *et seq*.

9. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim—namely, the solicitation calls to the Plaintiff Moore—occurred in this District.

### Statutory Background

The TCPA Prohibits Solicitation Calls to Numbers in the National Do Not Call Registry

10. The TCPA prohibits telemarketing calls to residential and wireless telephone numbers that have previously been registered on the National Do Not Call Registry. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2); 47 C.F.R. § 64.1200(e). ;

11. The TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).;

2

The Growing Problem of Telemarketing

12. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting Off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC chairman).

13. "The FTC receives more complaints about unwanted calls than all other complaints combined." Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking, CG Docket No. 02-278, at 2 (2016), https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

14. In fiscal year 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-nationaldo-not-call-registry-data-book-dnc.

15. *The New York Times* recently reported on the skyrocketing number of robocall complaints and widespread outrage about illegal telemarketing. Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html; *see also* Katherine Bindley, *Why Are There So Many Robocalls? Here's What You Can Do About Him*, Wall St. J. (July 4, 2018), https://www.wsj.com/articles/why-there-are-so-many-robocalls-heres-what-you-can-do-about-him-1530610203.

3

16. Industry data shows that the number of robocalls made each month increased from 831 million in September 2015 to 4.7 billion in December 2018—a 466% increase in three years.

17. According to online robocall tracking service "YouMail," 5.2 billion robocalls were placed in March 2019 at a rate of 168.8 million per day. www.robocallindex.com (last visited May 17, 2019). YouMail estimates that 2019 robocall totals will exceed 60 billion. *See id.*

18. The FCC also has received an increasing number of complaints about unwanted calls, with 150,000 complaints in 2016, 185,000 complaints in 2017, and 232,000 complaints in 2018. FCC, Consumer Complaint Data Center, www.fcc.gov/consumer-help-center-data.

**Vicarious Liability**

~~Factual Allegations~~

19. "The Federal Communications Commission has ruled that, under federal common law principles of agency, there is vicarious liability for TCPA violations." *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663, 674 (U.S. 2016) (internal citation omitted); *see also Smith v. State Farm Mutual Automobile Insurance Company*, 30 F.Supp.3d 765, 774 (N.D.Ill., 2014) (regardless of whether the FCC Ruling binds the Court or is merely persuasive authority, the Court finds that the FCC's determination that an entity may be vicariously liable for violation of section 227(b) under a broad range of common-law agency principles is correct."

20. Thus, "a seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification." *In the Matter of the Joint Petition filed by Dish Network, LLC*, 28 F.C.C. Rcd 6574, 6584 ¶ 28, (F.C.C. May 9, 2013))

4

21. The FCC reasoned that without vicarious liability a seller could "avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties [leaving] consumers in many cases without an effective remedy for telemarketing intrusions." *Id*. at 6588 (¶ 37). It also reasoned that "the seller is in the best position to monitor and police TCPA compliance by third-party telemarketers. We thus agree that, consistent with the statute's consumer protection goals, potential seller liability will give the seller appropriate incentives to ensure that their telemarketers comply with our rules." *Id.*

22. "Potential liability under general agency-related principles extends beyond classical agency." *Id.* at 6586 (internal citations omitted). For instance, "vicarious liability for TCPA violations in the telemarketing context may be found where "the seller knew (or reasonably should have known) that the telemarketer was violating the TCPA on the seller's behalf and the seller failed to take effective steps within its power to force the telemarketer to cease that conduct." *Id.* at 6592.

**Factual Allegations**

23. Defendant operates a Retail Partner Program in which Defendant contracts with third parties to engage in marketing on behalf of Defendant, including the marketing of Spectrum branded cable and internet services.

24. Defendant advertises the Retail Partner Program to call center businesses and authorizes its Retail Partners to use their call centers to conduct marketing on behalf of the Defendant over the telephone.

25. The Retail Partners have a direct relationship with Defendant and Defendant treats them as members of its own sales force.

5

26. The Retail Partners have access to Charter's software via an online portal where they can schedule customer installations, generate reports and redeem premiums.

27. Defendant provides its Retail Partners with the marketing messaging, materials, and resources that are to be used in their marketing on behalf of Defendant.

28. Defendant has dedicated employees who manage the Retail Partner relationships, monitor their performance on a daily basis, conduct regular site visits, and ensure their compliance with Defendant's rules and restrictions governing their conduct.

29. Charter has the right to give interim instructions or directions to its Retail Partners once their relationship is established and retains the capacity throughout the relationship to assess the Retail Partner's performance, provide instructions to the Retail Partners, and terminate the relationship by revoking their authority.

30. Charter has been aware for years that certain Retail Partners have engaged in illegal telemarketing on its behalf.

31. In 2015, the Missouri Attorney General sued Charter for violations of federal and state telemarketing laws arising from the telemarketing conduct of third-parties that were placing telemarketing calls on Defendant's behalf.

32. During the course of that lawsuit, the Missouri Attorney General alleged, among other things, that Charter "caus[ed] its Retailers to Engage in Initiating Outbound Telephone Calls" in violation of the law.

33. The Missouri Attorney General further alleged that Charter had been aware of illegal telemarketing conduct by its telemarketing agents since at least 2005.

34. The evidence presented in United States v. Dish Network LLC, 256 F.Supp. 3d 810, 859 (June 5, 2017), a similar lawsuit concerning illegal telemarketing by cable/internet

6

"retailers," also indicates that both Dish and Charter were aware of illegal actions by at least one of their retailers.

35. As a result of the Missouri Attorney General's lawsuit, Charter entered into a settlement agreement in 2017 requiring Charter to conduct an annual review of the methods used by any entity that conducts telemarketing on behalf of Charter in Missouri and to obtain a signed acknowledgment from such entities that they would comply with the terms of the settlement agreement.

36. Sometime prior to August 2018, Defendant entered into a Retail Partner agreement with EXPINFO, Inc. (EXPINFO), authorizing EXPINFO to be a Retail Partner and to engage in marketing on behalf of Defendant.

37. EXPINFO was a Florida corporation that was administratively dissolved in 2012 for failure to file an annual report.

38. At all relevant times, the CEO of EXPINFO was Tiya Bhattacharya ("Bhattacharya").

39. In 2014, the Federal Trade Commission sued Bhattacharya for Telemarketing fraud.

40. As a result of that lawsuit, Bhattacharya was permanently enjoined from participating in telemarketing.

41. As a result of that lawsuit, the FTC seized numerous assets from Bhattacharya, including bank account funds, mortgage agreements, luxury vehicles, and the net receivables of EXPINFO.

42. At all relevant times, Charter was aware, or should have been aware, that Bhattacharya was a telemarketing fraudster that would engage in similar illegal conduct on behalf of Charter.

43. In August 2018, Charter entered into another agreement with EXPINFO entitled "Charter Communications Marketing Rules."

44. The Charter Communications Marketing Rules Agreement was executed by Bhattacharya, on behalf of EXPINFO, and Michael G. Locke, on behalf of Defendant.

45. The Charter Communications Marketing Rules Agreement authorizes marketing by telephone and provides that EXPINFO must obtain Defendant's approval for all advertisements of Spectrum services.

46. In order to generate sales on behalf of defendant, EXPINFO created a website advertising the Spectrum branded cable and internet services. That website posted terms and conditions that purportedly authorize EXPINFO to place outbound telemarketing calls using automated equipment.

47. In order to generate sales on behalf of Defendant, EXPINFO posted online job postings for call center agents to make outbound telemarketing calls on behalf of Defendant.

48. At all relevant times, Charter was aware, or should have been aware, that Retailer Partners, including EXPINFO, were engaging in outbound telemarketing campaigns on behalf of Charter.

49. At all relevant times, Charter knowingly accepted the benefits of the telemarketing calls placed by its Retailer Partners, including EXPINFO, by accepting the new customers contracts that were generated for Charter as a result of those calls.

50. In November 2019, EXPINFO, on behalf of Charter, placed several telemarketing calls to Mr. Moore's telephone number, 630-XXX-1188.

51. Mr. Moore's number, 630-XXX-1188, is a residential telephone number on the National Do Not Call Registry.

52. Mr. Moore's number has been on the National Do Not Call Registry for more than 10 years prior to the calls he received.

53. Mr. Moore's number has not been removed from the National Do Not Call Registry at any time.

54. On November 11, 2019, Mr. Moore received two calls from EXPINFO on behalf of Charter, showing the Caller ID 733-780-1992.

55. Mr. Moore did not answer the calls.

56. However, they continued.

57. On November 12, 2019, Mr. Moore received another call from EXPINFO on behalf of Charter showing the same Caller ID number, 733-780-1992, and answered it.

58. The telemarketing representative claimed he was offering a discounted price for TV, internet and phone services.

59. When Mr. Moore asked him who he was calling from, he stated that he was calling from "Spectrum and AT&T Services".

9.

60. The telemarketer then offered Mr. Moore Spectrum services, which Mr. Moore indicated an interest in during the call to sufficiently identify the calling party.

61. Mr. Moore was also able to confirm Defendant's involvement by pretending to be interested in the services and obtaining a reference number.

9

~~11.~~

62. Mr. Moore confirmed that the reference number was needed to confirm the telemarketing conduct, as the Caller ID number ~~used by Charter, or its telemarketer,~~ is a non-working number.

~~12.~~

~~13.~~63. Indeed, other individuals have complained about receiving robocalls from that number.

64. The website "Robokiller" has identified 93 calls from that number from the same timeframe Mr. Moore was called. *See* https://lookup.robokiller.com/p/733-780-1992 (Last Visited December 6, 2019).

65. During the call, EXPINFO stated that it was running a credit check on Mr. Moore to ensure that he qualified for Charter's services.

~~14.~~66. During the call, EXPINFO gave Mr. Moore an installation appointment date for the installation of Charter's services.

67. Immediately following the November 12, 2019 phone call, Defendant sent Mr. Moore two emails that identified Defendant by name ("Charter Communications"), said "Thank you for choosing Charter," and asked Mr. Moore to complete his order for Charter services.

68. A reasonable person receiving these calls, and the follow up emails from Charter, would believe that the caller had the authority to act on behalf of Charter.

~~15.~~69. Mr. Moore did not provide his prior express invitation or permission to Charter to make telemarketing calls to him.

10

~~16.~~70. Mr. Moore and others who received these calls were harmed by ~~the~~Defendant's calls because the calls temporarily deprived them of the legitimate use of their phones, wasted their time, and invaded their privacy.

**Class Action Allegations**

~~17.~~71. As authorized by Rule 23(b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff sues on behalf of other persons or entities throughout the United States.

~~18.~~72. The proposed Class is tentatively defined as:

> All persons within the United States: (1) whose telephone numbers were listed on the Do Not Call Registry for at least 31 days, and (2) to whom, at any time within the four years prior to the filing of this action, Defendant, or someone on its behalf, (3) placed more than one call within any twelve-month period to promote the sale of Charter products or services.

~~19.~~73. The Plaintiff is a member of the Class.

~~20.~~74. Excluded from the Class is the Defendant, any entities in which the Defendant have a controlling interest, the Defendant' agents and employees, any Judge to whom this action is assigned, and any member of the Judge's staff and immediate family.

~~21.~~75. Class members are identifiable through phone records and phone number databases that will be obtained through discovery.

~~22.~~76. Based on the nature of telemarketing campaigns, there are likely thousands of class members. Individual joinder of these persons is impracticable.

~~23.~~77. There are questions of law and fact common to Plaintiff and the proposed class, including:

    a. Whether the ~~Defendant's~~ calls are "solicitations;"

    b. Whether the Defendant obtains prior express invitation or permission to place solicitation calls;

      c.      Whether the ~~Defendant placed~~ calls <u>were placed</u> to numbers on the Do Not Call Registry;

      d.      Whether the Defendant's TCPA violations were negligent, willful, or knowing; and

      e.      Whether the Plaintiff and the class members are entitled to statutory damages because of the Defendant's actions.

~~24.~~<u>78.</u> Plaintiff's claims are based on the same facts and legal theories as class members, and therefore are typical of the class members' claims.

~~25.~~<u>79.</u> Plaintiff is an adequate representative of the Class because his interests do not conflict with the Class' interest, he will fairly and adequately protect the Class' interests, and he is represented by counsel skilled and experienced in litigating TCPA class actions.

~~26.~~<u>80.</u> The Defendant's actions are applicable to the Class and to Plaintiff.

~~27.~~<u>81.</u> Common questions of law and fact predominate over questions affecting only individual class members, and a class action is the superior method for fair and efficient adjudication of the controversy. The only individual question concerns identification of class members, which will be ascertainable from records and databases maintained by Defendant and others.

~~28.~~<u>82.</u> The likelihood that individual class members will prosecute separate actions is remote due to the time and expense necessary to prosecute an individual case, and given the small recoveries available through individual actions.

**FOR A FIRST CAUSE OF ACTION**

**(Violation of the TCPA's Do Not Call provisions)**

~~29.~~83.  The above allegations are realleged to the extent not inconsistent with the allegations of this cause of action.

~~30.~~84.  The Defendan<ins>t is vicariously liable for violating</ins>~~t violated~~ the TCPA b<ins>ecause its agent, EXPINFO,</ins> ~~y (a)~~ initiat<ins>ed</ins>~~ing~~ more than one solicitation call to the Plaintiff in a twelve-month period <ins>on Defendant's behalf</ins> while Plaintiff's number was on the National Do Not Call Registry<ins>.</ins> ~~or (b) by the fact that others caused the initiation of those calls on its behalf.~~ *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2); 47 C.F.R. § 64.1200(e).

<ins>85.  Defendant is vicariously liable for those calls because EXPINFO acted with actual authority, the calls were placed with Defendant's apparent authority, and/or Defendant ratified the conduct.</ins>

~~31.~~  The Defendant's violations were willful or knowing.

86.

WHEREFORE, the Plaintiff requests the following relief:

    A.    That the Court certify the proposed Class;

    B.    That the Court appoint Plaintiff as class representative;

    C.    That the Court appoint the undersigned counsel as counsel for the class;

    D.    That the Court enter a judgment awarding Plaintiff and all class members statutory damages of $500 for each violation of the TCPA and $1,500 for each knowing or willful violation;

    E.    That the Plaintiff and all class members be granted other relief as is just and equitable under the circumstances.

**The Plaintiff demands a jury trial on these issues.**

                PLAINTIFF,
                By his attorneys

                /s/ Timothy J. Sostrin
                Timothy J. Sostrin
                Keith J. Keogh
                KEOGH LAW, LTD.
                55 W. Monroe St. Suite 3390
                Chicago, IL 60603
                tsostrin@KeoghLaw.com

                Anthony I. Paronich
                Paronich Law, P.C.
                350 Lincoln Street, Suite 2400
                Hingham, MA 02043
                (508) 221-1510
                anthony@paronichlaw.com